```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF VIRGINIA
                      Roanoke Division

----------------------------x
                            :
DEMETRIUS HILL,             :
                            :
        Plaintiff,          :
                            :
v.                          :    7:08CV283
                            :
TERRY O'BRIEN, et al.,      :
                            :
        Defendants.         :    Big Stone Gap, Virginia
                            :    October 6, 2011
----------------------------x    9:22 a.m.
```

PARTIAL TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JAMES C. TURK
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

    ARLENE SOKOLOWSKI-CRAFT, Esquire
    7425 Royalton Road
    North Royalton, Ohio  44133
       Counsel for the Plaintiff.

    THOMAS L. ECKERT, Esquire
    U.S. Attorney's Office
    P.O. Box 1709
    Roanoke, VA 24008
       For the United States of America.

Proceedings recorded by Stenography, transcript produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

```
 1       (Proceedings commenced at 9:39 a.m.)
 2       (Proceedings were had and reported, but not
 3  transcribed.)
 4           WILLIAM CRUM, PLAINTIFF'S WITNESS, SWORN
 5                    DIRECT EXAMINATION
 6  BY MS. SOKOLOWSKI-CRAFT
 7  Q    Good afternoon, Officer Crum.
 8            MS. SOKOLOWSKI-CRAFT:  I'd like to note for the
 9  record, Your Honor, that although we did receive documents
10  from defendants with respect to Mr. Taylor, we did not
11  receive any documents from defendants with respect to
12  Mr. Crum.  So, I don't know if Mr. Crum --
13  BY MS. SOKOLOWSKI-CRAFT
14  Q    Did you ever provide any documents to your attorneys
15  regarding this lawsuit?
16  A    I didn't have any documentation.
17  Q    Okay.  Nothing occurred on November 7th, November 1,
18  2007?
19  A    From what you're accusing, from what he's accusing, the
20  sprinkler was broken.  They submitted to restraints, which
21  means there was no use of force.  We removed them from the
22  cell, placed them in a dry cell so that their cell could be
23  cleaned up and the sprinkler repaired.  As far as me going
24  in his cell, that's not against policy, but I don't recall
25  if I did, or not.  I never assaulted him, but I mean that's
```

1 typical, that's not use of force. Once they're in
2 restraints and they, they're considered compliant you can
3 open the door one on one, escort them out, put them in a dry
4 cell. That's for their safety. Once they're placed in a
5 holding cell or a dryer place, we try to fix their cell so
6 that they can go back in it, or if we have extra cell space,
7 which is rare, we'll put them in a different cell. Just
8 from what I've talked to the attorney, I gather something
9 later that day happened that required the use of force. But
10 from my involvement, I don't remember anything. If there
11 had been use of force, yes, I would have documentation on
12 that policy.
13 Q     Is it your testimony that you don't even know how
14 Mr. Hill got out of his cell and into another one?
15 A     Yeah. They submitted to restraints from what is
16 written in here in his accusations. He was cuffed up, so he
17 submitted to restraints. Cuffs don't magically go on them.
18 Q     When the sprinkler broke, who was the first person that
19 went into the cell when the sprinkler was broken?
20 A     Nobody would have went into the cell until their hands
21 were restrained. That's my point. Nobody goes into a cell
22 with an uncuffed inmate unless there's cause for an
23 immediate use of force, they're fighting, somebody is
24 hanging themselves, somebody is bleeding and obviously
25 injured that requires immediate action. Nobody does that,

```
 1  not in Special Housing.  No dealings with inmates
 2  unrestrained, whatsoever, unless it's an emergency.
 3  Q    Did you, who went in and got Mr. Hill out of that cell
 4  then?
 5  A    From what I've been told through your accusations, I
 6  did.  I got him, and another staff member got his cellmate.
 7  But like I said, I don't recall that.  It's four years ago.
 8  Had there been a use of force I might have recalled it, but
 9  I don't remember.  As far as I remember, me and him got
10  along pretty good.
11  Q    So, you don't recall anything that day?  You don't
12  recall going in and cuffing up Mr. Hill and talking him into
13  another cell?
14  A    No, ma'am, I don't recall that.  But that's typically
15  what would happen in that situation.  That's typically what
16  would happen.
17  Q    You just heard Mr. Johnson testify that if a sprinkler
18  is broken nobody goes in and gets --
19  A    Mr. Johnson testified he refused to submit to
20  restraints, and he was making deals, "You get me a cell, and
21  then I'll cuff up."  That's different.  That's an inmate
22  utilizing what they have to try to get something that they
23  want.  And if we gave everybody that broke the sprinkler a
24  new cell that they wanted, we'd have every sprinkler in the
25  house broken.  See, that's different.  If he was
```

Crum - Direct

```
 1  unrestrained, yes, that's against policy to go in and it
 2  does not warrant an immediate use of force.
 3  Q    It's your testimony you don't even recall going in and
 4  getting Mr. Hill?  Do you know the other officer that would
 5  have apprehended Mr. Logan?
 6  A    According to your lawsuit it was Officer Martin.
 7  Q    Is Officer Martin here today to testify?
 8  A    Ma'am, I couldn't tell you.  I don't know.  I've been
 9  in here with you all.
10  Q    I'll give you that.  So, you don't recall yourself
11  getting Mr. Hill out of the cell, and you don't know whether
12  Mr. Martin got Mr. Hill out of his cell?
13  A    I wouldn't, if, if that's what he says, I can't negate
14  it.  I don't remember.
15  Q    Were you in SHU on November 1, 2000 --
16  A    Honestly, I don't remember.  I don't know.  I haven't
17  been at work for a while, so I don't even have my documents
18  to look at my, where I was.  I don't even recall.  He may
19  have, he could have made up the whole fact that I was there
20  all together.  But I cannot do that.  I don't know.  All I
21  can argue is I didn't assault the inmate.
22  Q    Let's go back to that time frame so we can, at least,
23  get to where were you at that day.  How many individuals
24  generally, officers, work on SHU?
25  A    Depends what time of the day.  From 8:00 you've got SHU
```

1  rec, SHU property, and SHU lieutenant, you've got SHU one,
2  two, three, four, five, and sometimes a lieutenant on
3  evening watch.
4  Q    So, anywhere from eight individuals to six?
5  A    Anywhere from five to eight, yes.  Midnight to 8:00
6  a.m. you've only got two.
7  Q    Depending on time of day, do you recall anything having
8  to do with a broken sprinkler on November 1, 2007?  Do you
9  recall being there that day, hearing about it?
10 A    I don't recall specifically.  I do remember the inmate
11 very well.  Like I said, he was very litigious, very
12 manipulative.  He desired a lot of attention, you know.  It
13 was every day, you know.  And like I said, I thought I had a
14 good rapport because I was typically the one that went down
15 and talked to him, me and the lieutenant.  Of course there
16 was times he was just so aggravated you couldn't deal with
17 him, but if it came down to trying to walk a thin line
18 between keeping him in line and not giving him everything he
19 wants to reward his bad behavior at the same time, but I
20 don't recall at any time where I had any, any type of force
21 with him other than, like I said, just typical escorts,
22 without even use of force.  I can't remember any type I was
23 involved in any use of force.
24 Q    Okay. You indicated that Mr. Hill was litigious.  Do
25 you know when Mr. Hill arrived at USP Lee?

1  A    No, ma'am. I know he was there for a while, and the
2  whole time he was there he was in Special Housing.
3  Q    Would you disagree that, if I told you he got there
4  around September, October, of 2007, would that sound about
5  right?
6  A    I would think he got there before that, but I don't
7  remember.
8  Q    Okay. He hadn't been there a long time, right, in
9  November of 2007?
10 A    I don't recall.
11 Q    You indicated that you knew Mr. Hill was litigious.
12 How did you know this?
13 A    Because, from his own words, he would always tell me
14 how he was filing this, that and that to try to get, you
15 know, get what he needed. He was free with that
16 information.
17 Q    He filed complaints against you, also?
18 A    Oh, no, other than this, which I never knew about this
19 until I got notified, no. He never, as far as I can recall,
20 he never filed anything on me. I've never had anybody file
21 too much force on me before, to my knowledge, at all.
22 Q    You've never had a claim of that?
23 A    Not to my knowledge.
24 Q    Well, could there be a claim and you not know about it?
25 A    Typically, no. They typically question you about it.

1 Unless it was just totally, unless they, the, they looked at
2 the camera and it didn't mean anything, I guess they
3 wouldn't have questioned me.  But I don't know of any.
4 Q    Have you ever had complaints lodged against you by
5 inmates?
6 A    I'm sure.  Any officer that does the job is going to
7 get complained of it.
8 Q    Have you ever been complained of having an
9 assaultive --
10 A    I don't think I've ever been, no.  Like I say, I
11 typically don't get into use of force unless I have to.
12 Even when we have to use force it helps to try to keep a
13 good rapport even when an inmate is fighting, he knows
14 you're being fair, then when he calms down you have a better
15 chance of handling it.
16 Q    If you had any complaints would these be in a personnel
17 file?
18 A    I assume so, yes.
19 Q    If an inmate makes a complaint against you, what's the
20 process?
21 A    I don't know.  I've never been through the process so I
22 don't know what to tell you.
23 Q    Nobody has ever said, "Hey, inmate (sic) so and so
24 assaulted him"?
25 A    No my knowledge, no.

1  Q    How long have you been out of work?
2  A    Since February.
3  Q    What happened?
4  A    I got a herniated disc, two crushed discs, and a
5  herniation pressing on a nerve that goes down my leg.
6  Q    From what?
7  A    I fell going up some stairs.
8  Q    I'm asking, I didn't know if there was any use of force
9  incident, or anything of that sort.
10 A    No.
11 Q    As I stated earlier, you're indicating that you never
12 had any documents of that?
13 A    Not that I know of.
14 Q    We were not provided your personnel file, so that's why
15 I'm asking as to whether or not you have complaints in
16 there?
17 A    Not that I know of.
18 Q    On the date in question, let's go to that time frame,
19 November, say November, December of 2007, did you have any
20 specific unit you were assigned to during that time frame?
21 A    I don't remember. I worked in SHU a lot. But I don't
22 know.
23 Q    How do you get in the SHU? Do you ask for it?
24 A    Like he told you. Every three months officers bid on
25 posts that they want, and they go by seniority.

Crum - Direct

```
 1   Q    Why would you want to be in SHU?
 2   A    Like he said, you're working with a lot of people.  It
 3   makes time go faster.
 4   Q    Are you primarily in SHU?
 5   A    Used to be, yeah.  Back then I used to work it a lot,
 6   yes, ma'am.
 7   Q    What shift did you generally work?
 8   A    Day watch, or morning watch, sometimes midnight to 8:00
 9   a.m.
10   Q    Are you aware of when the sprinkler broke?
11   A    No, ma'am, I don't remember.
12   Q    So, if I asked you who broke the sprinkler you wouldn't
13   have any answer?
14   A    Honestly, he broke a lot of sprinklers.  From my
15   understanding in the paperwork his cellmate broke this one,
16   but it really doesn't matter.  We didn't punish him for
17   breaking the sprinkler.  We removed him from the cell
18   because it's a health risk.  We moved him so we could clean
19   the cell, replace the sprinkler, get it proper again, and
20   then put him back in.  That's typical.
21   Q    You just said you guys didn't punish him for breaking a
22   sprinkler, correct?
23   A    I didn't.
24   Q    Are you aware of Mr. Lewis was placed in ambulatory
25   restraints for up to 17 hours?
```

Crum - Direct

1  A    That's up to the captain and the warden.  We may be the
2  one to place them in restraints; we don't determine when
3  they go in.  A lot of times the inmate is not complying with
4  orders.  I can't say, "Place him in ambulatory restraints
5  and leave him that way."  I'd be in prison with him.
6  Q    You concede on this incident, your attorney concedes
7  that Mr. Logan was the one that broke the sprinkler,
8  correct?
9  A    That's what I understand.
10 Q    But it's your testimony today that you don't recall
11 that incident at all?
12 A    No, ma'am, I don't.  Just because it was another day.
13         MS. SOKOLOWSKI-CRAFT:  If I can have a moment with
14 my client, Your Honor?
15         THE COURT:  Let me ask you this.  If you had
16 gotten into a scuffle or something, you'd probably remember
17 it?
18         THE WITNESS:  I would have had documentation on
19 it.  If that had happened, we typically, he would have gone
20 into ambulatory restraints rather than placed in the hole
21 with his buddy.  That wouldn't have happened.  If we would
22 have had to use force on him, he would have been segregated
23 from everybody and restrained in restraints.
24         THE COURT:  Right.
25

Crum - Direct

```
 1  BY MS. SOKOLOWSKI-CRAFT
 2  Q    Okay.  I'm hoping you know the answer to this question.
 3  Do you know if there are any cameras in Special Housing
 4  Unit?
 5  A    Yes, ma'am.
 6  Q    Where are they usually located?
 7  A    Down the ranges, in the general area, out in rec, just
 8  about anywhere you go in SHU has got a camera on it.
 9  Q    So, if somebody was going in and out of a cell you
10  would be able to see that?
11  A    Yes, ma'am.
12  Q    Do you know what the retention policy is of videotapes?
13  A    I don't have a clue.  But I would say since nobody
14  reported this so-called assault for so long, you probably
15  won't have it.  I don't know.  I didn't hear about this
16  until recently.  I doubt they hold it for four years hoping
17  an inmate might decide to file a claim on somebody.
18  Q    When you say recently, are you aware this lawsuit was
19  filed in 2008?
20  A    No, I wasn't.  I was made aware of this a year ago, a
21  little over a year.
22  Q    I'm letting you know the lawsuit was filed in 2008, and
23  the alleged incident occurred in --
24  A    My point is that after the incident, if an incident had
25  happened and he had filed the paperwork, not through me, to
```

Crum - Direct

```
 1  SIS, the captain, the warden, he gets paperwork done any
 2  time, or if they would have had an accusation that something
 3  happened on that day, I'm sure the tapes would have been
 4  kept.  Right now I don't know how they would, long they
 5  would keep.  That's just my assumption.  You'd have to ask
 6  somebody from SIS.
 7  Q    It's your testimony you just found out a year ago --
 8  A    A little over a year, I'm guessing.  I don't know the
 9  exact date, but it was a little over a year.  It was while I
10  was still working, so it was probably a year.
11          MS. SOKOLOWSKI-CRAFT:  Your Honor, I would just
12  repeat my objection on the grounds that I most definitely
13  need initial disclosures and documentation with respect to
14  this incident.  I was never provided these documents, and
15  obviously I have nothing that I could refresh the
16  recollection --
17          THE COURT:  What documents do you want that you
18  haven't gotten?
19          MS. SOKOLOWSKI-CRAFT:  The entire incident.  The
20  November 1, 2007 incident.
21          THE WITNESS:  There was no incident, so there's no
22  documentation.  That's my point.
23  BY MS. SOKOLOWSKI-CRAFT
24  Q    He was still put in ambulatory --   what I'm looking
25  for, Mr. Crum, is that if you were not a part of it, okay,
```

Crum - Direct

1   but what I'm telling you is there was something occurred in
2   2007, he was placed in ambulatory restraints, shackled,
3   cuffed with no mattress, a pillow for 17 hours.  You have a
4   videotape of A task force got assembled and came in and took
5   Mr. Logan and did all this.  I have no documentation on any
6   of that.
7           MR. ECKERT:  I'm going to object to that.  That
8   part of the lawsuit has been dismissed, Your Honor.  The
9   only thing wrong here today is an incident happened before
10  any of that, and that's where she is saying, or Mr. Hill is
11  saying Officer Crum went in and assaulted him at the same
12  time as he was removing him from the flooded cell.  There's
13  nothing before the court about ambulatory restraints.  And
14  there may be photographs or video of that, but that was all
15  dismissed by the court.  That's not what we're here on
16  today.
17          THE COURT:  He didn't know about it for a long
18  time.
19          MR. ECKERT:  That's right, Your Honor.  That was
20  dismissed.  That's not what we're here on.
21          THE COURT:  Whether or not this witness assaulted
22  him on November 1st.
23          MR. ECKERT:  Right.
24          THE COURT:  In his cell.
25          MR. ECKERT:  When he removed him from the flooded

Crum - Direct

1   cell.  It's very specific what we're here on today.  All
2   that, the ambulatory restraints, it's all been dismissed.
3               THE COURT:  As far as I know, nothing happened.
4   So, there would be no record of any altercation there
5   because it didn't happen.
6               MR. ECKERT:  That's right.
7               THE COURT:  Okay.
8               MS. SOKOLOWSKI-CRAFT:  Quite frankly, Your Honor,
9   I'd like to at least ask the court to even consider its
10  dismissal of the rest of the complaint because we've had
11  acknowledgment today that Mr. Crum just testified that
12  Mr. Hill shouldn't even have been punished and put in
13  ambulatory restraints because he didn't break the sprinkler
14  head.
15              THE COURT:  He said he wasn't punished for
16  anything he did because he didn't do anything.
17              THE WITNESS:  I can't testify to what he did after
18  I removed him from the cell.  His actions dictate what we do
19  to him in any case.  I don't know what he did placing him in
20  ambulatory, but I'm sure it was something.  What I'm saying,
21  regardless of what he does, my job is to ensure his safety,
22  my safety and other staff, and to prevent him from hurting
23  us and others.  That's why they're in Special Housing Unit.
24              THE COURT:  The plaintiff can testify about what
25  his memory is what happened on that occasion.  But this

Crum - Direct

```
 1  witness says he doesn't remember because there wasn't
 2  anything out of the ordinary.
 3          MS. SOKOLOWSKI-CRAFT:  I understand that, Your
 4  Honor, and for the record I would like to know, Your Honor
 5  has previously dismissed the other claim of ambulatory
 6  restraints stating there was cause for it based on a broken
 7  sprinkler --
 8          THE COURT:  I can't recall exactly what happened,
 9  I think when at that time the Fourth Circuit required
10  something more than a de minimus injury, and the suit had
11  alleged that, and I think I dismissed it, it went up to the
12  Court of Appeals, the law was changed in the meantime, and
13  it came back.  I expect that's when.
14          MS. SOKOLOWSKI-CRAFT:  Again, Your Honor, I'm
15  proving to the court that there's different testimony being
16  given here today than what was addressed in those motions,
17  and I know that's not what we are here for today, but it's
18  part of this case --
19          THE COURT:  It was dismissed other than on these
20  two occasions, so that's what we're interested in,
21  November 1st and January 15th.
22          MS. SOKOLOWSKI-CRAFT:  Again, I'm asking for you,
23  for you to reconsider all the other statements and all the
24  other complaints and all the other allegations my client has
25  made based on his testimony.
```

1    THE COURT: They're not before the court at this
2 time. We're here to determine whether or not he was
3 assaulted maliciously and sadistically on November 1st of
4 2007. It's a simple matter. The plaintiff can testify as
5 to what happened. At 2:00 I believe we have another
6 witness.
7    MS. SOKOLOWSKI-CRAFT: I have no further
8 questions, Your Honor.
9    THE COURT: What we'll do is we'll ask this
10 witness to stand aside for the time being, and we'll take
11 the video so you can examine him.
12    (Proceedings were had and reported, but not
13 transcribed.)
14    (Proceedings concluded at 3:50 p.m.)
15
16                          CERTIFICATE
17
18    I certify the foregoing is an accurate transcript
19 from the record of proceedings in the above-entitled
20 matter.
21
22
23  4/17/12                /s/ Bridget A. Dickert
    Date                   U.S. Court Reporter
24
25