```
            IN THE UNITED STATES DISTRICT COURT FOR THE
                   WESTERN DISTRICT OF VIRGINIA
                        Roanoke Division

--------------------------x
                          :
DEMETRIUS HILL,           :
                          :
       Plaintiff,         :
                          :
v.                        :   7:08CV283
                          :
TERRY O'BRIEN, et al.,    :
                          :
       Defendants.        :   Big Stone Gap, Virginia
                          :   October 7, 2011
--------------------------x   9:39 a.m.
```

                   PARTIAL TRANSCRIPT OF JURY TRIAL
                 BEFORE THE HONORABLE JAMES C. TURK
           SENIOR UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

        ARLENE SOKOLOWSKI-CRAFT, Esquire
        7425 Royalton Road
        North Royalton, Ohio  44133
             Counsel for the Plaintiff.

        THOMAS L. ECKERT, Esquire
        U.S. Attorney's Office
        P.O. Box 1709
        Roanoke, VA 24008
             For the United States of America.

Proceedings recorded by Stenography, transcript
produced by computer.

                      **BRIDGET A. DICKERT**
                   **UNITED STATES COURT REPORTER**
                  **180 WEST MAIN STREET, ROOM 104**
                     **ABINGDON, VIRGINIA 24210**
                        **(276) 628-5116**

1      (Proceedings commenced at 9:39 a.m.)

2      (Proceedings were had and reported, but not

3  transcribed.)

4          MS. SOKOLOWSKI-CRAFT:  Ladies and gentlemen of the

5  jury, thank you again for being here yesterday and today.  I

6  know that people had to miss work and family, and every

7  daily event of their lives, so we thank you, and Demetrius

8  Hill definitely thanks you for being here today to hear this

9  case.

10     Essentially, what we're hoping that you're taking out

11  of this case is the fact that there is no difference between

12  a human being and an inmate.  Unfortunately, sometimes

13  people forget that, and sometimes inmate correctional

14  officers, jail correctional officers forget that.  In this

15  case the defendants forgot that inmates are human beings,

16  that Mr. Demetrius Hill is entitled to the same rights that

17  the rest of us are entitled to.  What we're asking for you

18  to hear today is to consider all of the evidence that we

19  have put into the record, and to look at the facts that your

20  decision has to be by a preponderance of the evidence.

21     What that means is it only has to be 51 percent or

22  more; it does not have to be beyond a reasonable doubt.  The

23  fact of the matter is everybody has different versions of

24  events.  It's your job to look at all those events and to

25  make a decision to say, "Okay, I think this is what

1    happened.  I believe this person.  I don't believe this

2    person."  It does not have to be beyond a reasonable doubt.

3    This is a civil case.

4         So, the question is what has the evidence shown you

5    today?  Well, most importantly what I would like to point

6    out to the court is that defendant Crum is not here today.

7    I take that personally, and I would hope that the jury would

8    look at it also.  The fact of the matter is, he's being sued

9    in this civil case, he's known about this case, this case

10   was filed in 2008, so for him to testify that he didn't know

11   about the case and then for him to stand up there and say,

12   "I forgot about everything, don't remember a thing, and I

13   don't even know why I'm here," when the evidence we have

14   presented to the jury is Mr. Hill, Demetrius, he did file

15   those complaints, and in those complaints, he noted in those

16   complaints, "I am exhausting my administrative remedies so I

17   am entitled to file an action against you.  Please retain

18   the video of what occurred."

19        Despite that, defendant Crum got up on the stand and

20   said, "I don't remember anything.  I'm not sure if I even

21   worked that day.  And by the way, I don't want to be here."

22   That's how serious he takes this case.  The fact is that he

23   was so confident that he was going to win he doesn't want to

24   waste his time being here today.  I think that's extremely

25   significant, and I think that should be viewed by the jury

1    and put the weight to it that you should.

2         The facts, the facts as Mr. Hill, Demetrius, has

3    testified, basically allege that on November 1, 2007

4    defendant Crum entered into his cell after he had already

5    handcuffed him.  Defendant Crum then entered into his cell

6    and kneed him, punched him, elbowed him and then got him out

7    of the cell and obviously placed him into another cell.

8         The defense would have you believe this event never

9    happened; and number two, if it happened that Mr. Hill was

10   not injured in any way, therefore he's not entitled to a

11   claim.

12        The problem with that is the defense gives you a video,

13   the only video I remind you, even though there's videos

14   throughout the facility that could have been utilized to

15   finish this case a lot quicker, but the only video is, the

16   defense provides you is one which shows you two or three

17   hours later, at least an hour to two hours later where

18   Mr. Hill was standing in a cell.

19        Interestingly enough, there's no audio so nobody can

20   hear what these people are discussing, or what anybody is

21   talking about.  What is even more interesting is that you

22   have officers in riot gear, and you barely ever see

23   Mr. Hill's face.  The limited time that you do see his face,

24   and I point you specifically to the time of 4:40 p.m. to

25   4:41, and if the tape is taken back with you you can review

1    it because of the limited time that you see it, you can see

2    that one of his eyes looks like they're swelling.

3        As you recall, Nurse Mead testified and she said, "I

4    don't recall seeing anything."  Again, if you look at this

5    tape, and if you remember the testimony of several other

6    officers and of Nurse Meade, and I believe Mr. Laster, that

7    a nurse needs to be present when they're doing a use of

8    force; that nurse needs to be present and to be there while

9    the tape is being, while they're being videotaped.

10       If you look at the time that Nurse Mead has put into

11   her report, which is 4:50, and you look at the time on the

12   video you're not going to see Nurse Mead.  She may be there.

13   If she's there, she's in riot gear.

14       I know Demetrius testified he remembered her being

15   there, or thinks he was there.  But quite frankly, I can't

16   find her on the tape.  So, if she's there she would have

17   checked him very quickly, and if she's there he won't have

18   had any opportunity to talk to her because she's wearing big

19   head gear, and she's in riot gear.

20       As a prisoner, how are you going to distinguish who is

21   the nurse and who are the other individuals when you're

22   turned around being shackled?  I ask you to take that into

23   consideration.  The only proof we have on video, you have a

24   video to show you that, and to show that you -- yes, Nurse

25   Mead testified she didn't see anything, but how quickly did

1    she look at him, and was she even there, would be my

2    question.

3         Moving forward on that event, the defendants will say

4    there was no broken leg, there was no broken arm, something

5    of that sort.  The problem with that is you have an

6    individual who is claiming to be assaulted.  He's put in

7    another cell, nobody checks on him, nobody talks to him, and

8    immediately they have a use of force team arrive, put him in

9    ambulatory restraints and put him in another room for 17

10   hours.

11        What happens when you're in ambulatory restraints?

12   You're cuffed, cuffed in arms and legs, and you're put into

13   a room.  He's not receiving any medical care.  People are

14   checking on him periodically to make sure he's okay, but

15   nobody is going in there to see if he's all right to check

16   on him, or to take care of any bruises or any injuries, or

17   likewise.

18        So, whatever those injuries were that he had are only

19   exacerbated by the fact that not only were you just beat up

20   at this point, but then you're shackled, you're put into a

21   cell, and you're left there for almost 24 hours later.

22        And for the defense to argue that, oh, well he wasn't

23   injured so it's minor, it's not that bad, just imagine if

24   you're sitting there and not getting any care, whatsoever.

25   We acknowledge there was no broken arm, there was no broken

1    leg, but the fact of the matter is not only psychologically

2    and emotionally are there damages that have been accrued as

3    a result of Officer Crum's actions, but also physically

4    because we don't know -- I'm sure Mr. Hill has back

5    problems, and neck problems, and we won't know how they

6    accrued throughout his life, but they weren't helped by the

7    fact he was assaulted and then put into ambulatory

8    restraints for 17 hours.

9        The next incident is the one against Mr. Taylor.  That

10   issue you need to take into consideration is as to why there

11   is no videotape.  The defense will say we didn't see

12   anything so therefore we disposed of the videotape, or

13   whatever reason they provide for that.

14       What I proffer to you is if you are being charged with

15   assaulting somebody, wouldn't you like to have that

16   videotape to exonerate you if you didn't do anything?  You

17   had individuals that testified that those areas were

18   recorded.  You've had individuals that testified that yes,

19   that area is a common area; that we have a policy that if

20   use of force is used we'll review the tape, at the very

21   least for 14 days, the very most likely they'll save it for

22   two years.

23       The problem that you have here is nobody ever saved it,

24   nobody ever presented it, nobody ever saved it.  What's more

25   important is that as you heard Demetrius testify, he was

1   written up for that, he was written up, the officer said you
2   were being disrespectful, you were being uncooperative, we
3   are going to write you up for that.

4        He went to the hearing for that.  At that hearing he
5   was found not guilty.  I know it's a hearing, it's not a
6   trial, but he was exonerated of the charge of cooperation.
7   Yes, he was found to have been disrespectful and threatening
8   an officer, but that was after all of this had already
9   happened, and after Mr. Hill was already in restraints.

10       So, you cannot confuse the fact that if he threatened
11  somebody after the event.  Whether that happened, or not,
12  you heard Mr. Hill testify, "I could have done that because
13  I was so upset with the fact that I'm getting kneed, I'm
14  getting pressure points put into my neck and into my head,"
15  that yes, he was probably angry.  I can only imagine, but
16  the actual charge that was placed before him he was
17  exonerated on.

18       Another thing that's even more important in my eyes is
19  that you had Mr. Taylor testify, and then you also had
20  Mr. Fortner testify.  What's significant about that is look
21  at the way Mr. Taylor is removing himself out of the
22  situation.  Mr. Taylor is trying to say, "I was just walking
23  along and I happened to come across Fortner and Hill, and I
24  came in to assist."

25       The problem with that is Taylor is the one that wrote

1    up all the reports, Taylor is the one that wrote up the

2    discipline that he was being threatened, and that Mr. Hill

3    wasn't following Taylor's orders.  That's kind of

4    interesting that Mr. Fortner is the one that's coming up

5    here testifying, that he's the one that's taking care of

6    this whole situation.  Yet Mr. Fortner was not the one that

7    wrote up the report.  He's not the one that wrote up the

8    disciplinary hearing.  It was Taylor.  Fortner wrote up one

9    incident of what he witnessed and what occurred, and that

10   was it.  The rest of the matter was laid at the hands of

11   Officer Taylor.  Yet he sat here today and tries to push

12   everything off on Fortner.  "I was just walking across the

13   hall and I happenstance to come across it."

14       In addition to the fact that Fortner, that Fortner took

15   the responsibility of that, I'm quite interested as to this

16   third person this Mr. Fortner testified to.  Quite frankly,

17   I think that that testimony right there should disqualify

18   the rest of his testimony because nowhere in any of the

19   evidence that has ever been produced, and nowhere in

20   Mr. Taylor's testimony did anybody ever reference a third

21   person standing there at the, a door.

22       If there was a third person, wouldn't it be great to

23   hear from that person?  Wouldn't it be great to have that

24   person come in and testify?  That would have been a third

25   person that would have witnessed these events.  Wouldn't it

 1  have been great for that person to also have been listed

 2  throughout any of these disciplinary hearings, he could have

 3  written up a report as to what happened, and that could have

 4  been used against Mr. Hill during his disciplinary hearing.

 5  None of that happened.  None of that happened.  And the fact

 6  that Mr. Fortner sat there and said, "Well, there was a

 7  third person that came up here," that's highly questionable.

 8       That goes to the whole -- the whole purpose of a jury

 9  is to say, "Okay, do we believe our testimony, or do we

10  not?"  Because suddenly now you're telling me there's this

11  third person, yet he never helped, so he stood there at the

12  door and watched everything happen, and everybody had to

13  wait for Taylor to hit a button for other officers to come,

14  but the door holder just happened to never jump in and help.

15  If you believe Fortner's testimony that's what you have to

16  belief.

17       I touched on the videos in this matter because I

18  believe they are extremely important.  I believe if there

19  were videos available that they would have, we would either

20  not be here or this would have been a much quicker trial.

21  You've got, you have evidence that will go back with you

22  where Mr. Hill specifically, in the November 1, 2008, tells

23  them, "I want the video.  Please save the video.  Yes, it

24  might not have what's going on in this cell, but at least it

25  will show whether or not Crum is going into the cell, when

1    he takes me out, what I look like when I'm taken out."

2    Nobody ever saves that.  You have the February 15th incident

3    whereby testimony, there's videotapes around there, Mr. Hill

4    has a hearing, a disciplinary hearing based on that.  He

5    files complaints, and mind you, that happened at the

6    beginning of January, 2008.  Mr. Hill filed his complaints

7    several months later.  So, he's going through this

8    disciplinary hearing, the video that's utilized throughout

9    all that, and now it's no longer available.

10       The reason that we are sitting here today is because

11   this is our judicial system, this is the way our judicial

12   system works.  Many may ask, well, couldn't there have been

13   something else that Mr. Hill could have done?  Could he not

14   have filed another, you know, exhaustive remedy, some type

15   of remedy throughout the process?  The problem with that is,

16   as you heard Mr. Hill testify, he already tried to do that.

17   He filed administrative remedies, and they went nowhere.  As

18   he testified, he doesn't even know the outcome of it.  All

19   he knows is he's telling them, "I have a problem, I believe

20   that I've been assaulted.  I need you to address this."  And

21   the response he gets is, "Okay, we'll deal with it, but we

22   can't even tell you what that end result was."

23       And needless to say, the officers are still working at

24   the facility, and they're still doing their jobs, and they

25   continue on a daily basis to appear back at SHU which is the

1    Special Housing Unit.  I think it's very hard for us to

2    understand what an inmate goes through, and the defense will

3    sit there and they'll paint Demetrius out to be a horrible

4    criminal from New York.  We acknowledges that because he

5    committed an armed robbery.  There's no defending that.  Am

6    I going to sit here and say he's Betty Crocker?  No, I

7    can't.  He's in a prison system, he's in a system where

8    individuals are getting into fights.  You have officers who

9    are disrespecting the law and overstepping their boundaries.

10   He's not going to sit there and say, "I'm just going to sit

11   here and take it."  He was actually doing what anybody would

12   expect him to do.  He filed letters.

13        The defense said, "Well, you filed hundreds of them."

14   Yes, he did.  He acknowledges that.  He's not embarrassed of

15   it.  He is doing what he's supposed to be doing, and he's

16   taking advantage of the written policies and taking

17   advantage of filing those administrative remedies to see if

18   something can be done.  Unfortunately, it wasn't.  That's

19   why we are here today before this jury.  Unfortunately, in

20   our judicial system we have no other recourse.  The only

21   other recourse we do have is to stand before you and to ask

22   for you to find damages against the defendants.

23        I'd like to point you also to Mr. Roff's testimony,

24   which was the other doctor that addressed the January, 2008

25   incident.  And what I would acknowledge about his testimony

 1    is that he acknowledged he's overworked, and that he was

 2    working 80 to 100 hours a week, and he was wearing the hat

 3    of two positions, one being an administrator, one being an

 4    assistant.

 5         If you even look at what happened with Officer Meade in

 6    the November incident you can see these incidents are quick.

 7    Nobody is going into a physician's office and doing a

 8    thorough review that you and I are interested in; they're

 9    being reviewed instantly.  Whether a shirt is being taken

10    off, we don't know.

11         Mr. Roff testified that this review was held in the

12    lieutenant's office.  Hill had his arms in handcuffs, so

13    that goes into how well of a review of Mr. Hill would have

14    occurred.  When you're running into a lieutenant's office,

15    looking at an individual probably for a couple of seconds

16    and then leaving, and really if you listen to Mr. Roff's

17    testimony he worked a lot, he acknowledged that, but

18    unfortunately that's the nature of the situation that he's

19    in.

20         Which gets us to the issue of damages.  And as I

21    repeated, this is Mr. Hill's only source of recourse.  So,

22    yes, he has to ask for damages.  The purpose of the damages

23    is to compensate Mr. Hill for not only the events that

24    occurred, but also to send a message to the officers, and

25    that is the purpose of punitive damages.

1      The purpose of punitive damages is to send a message to

2  these officers that they cannot continue to do this.

3  Obviously, the administrative remedies have not helped.  The

4  officers are still working there, and they're still enjoying

5  their salaries; they're still enjoying the position.  And as

6  far as they indicated, they've never been reprimanded for

7  anything.  So, Mr. Hill is asking you today to look at

8  compensatory damages and punitive damages for him to send a

9  message to not only these corrections officers, but every

10  other corrections officer at USP Lee, or anywhere else

11  throughout the United States.

12      This is a situation that occurs on such a larger basis,

13  and we're here today on this specific case, but when an

14  officer walks in and abuses his powers and doesn't think

15  that there's any recourse, doesn't think that there's any

16  recourse to the fact of the matter that he's not even here

17  today, he thinks, he's so confident that he's going to win

18  he didn't even bother to show up today.  And the defense, as

19  was explained to you during jury instructions and during

20  opening, wants so much for you to understand that it's not

21  the Government that's on trial here; it's the two

22  defendants.

23      Well, quite frankly, that's who they work for, and

24  that's who set up this system, and that's who is producing

25  the system that we go through hundreds and hundreds of

1    complaints, and yet no, officers don't even know of any

2    other officers that have been punished, and the officers

3    don't even know of, have never been punished themselves.

4    And Officer Crum didn't even know he had a complaint against

5    him.

6         So, my question is how much are these administrative

7    remedies actually applied?  With that said, regarding

8    damages, we ask that you consider for each of the defendants

9    $10,000 compensatory damages and $15,000 each in punitive

10   damages.  Compensatory damages are, are to compensate

11   Mr. Hill for this entire litigation, for this entire matter,

12   and for the injuries that he sustained.  The punitive

13   damages are to send a message, and unfortunately we have to

14   put a number on it.  What we're asking for each individual

15   is $25,000, which is a total of $50,000.  You can go lower

16   than that; you can go higher than that.

17        My job is to give you an idea of what we believe the

18   damages should be, but that's in your hands, and you make,

19   it's your decision, you can leave it at zero, you can leave

20   it at $1,000,000.  It's always left in your hands.

21        But what we do ask that you consider is that a message

22   needs to be sent.  You can't just simply abuse your powers,

23   or pretend things didn't happen, say I don't remember this

24   happened even though you're filing complaints against me

25   right after, and by the way somebody else destroyed the

1  video, so it's not my problem.  Everybody is just passing

2  the buck as to whose responsibility it was.  At the end of

3  the day it's the defendants' responsibility to make sure

4  they don't do it, and it's the defendants' responsibility to

5  make sure they defend themselves.  And if that's addressing

6  Mr. Hill's claims in the appropriate manner, that would be

7  great.  But that didn't happen, and that's why we're asking

8  you to make Mr. Hill whole.  Thank you.

9          MR. ECKERT:  May it please the court, ladies and

10  gentlemen of the jury, I, too, want to thank you all for

11  your time.  And there were several times, I guess, during

12  the trial when I may have talked over Ms. Craft, maybe

13  didn't let her finish a sentence, or something like that,

14  and if I did so I want to apologize to both her and to the

15  court and to y'all for doing that.  I'm afraid that may have

16  happened once or twice, and I want to apologize for that if

17  you all saw that.

18      You heard at the beginning of the trial that Mr. Crum

19  is on worker's comp, he was injured on the job, he was in

20  great pain yesterday.  It was very difficult for him to sit.

21  He's out of work on worker's compensation.  Everybody knows

22  what that is.  It means you're hurt too bad, and so bad you

23  can't function at your job.  He couldn't function.  He sat

24  in that chair all day yesterday with his injuries, and he

25  couldn't function.  And he's not here.  And you all knew

 1  that he was out on worker's comp.  A lot of people are out

 2  on worker's comp.  There's nothing wrong with that.  You're

 3  injured on the job, that's what you provide.  Some people

 4  get hurt.

 5      Well, the plaintiff claims that, that the defendants

 6  individually, on two different, in two different instances,

 7  two different occasions, violated his Eighth Amendment right

 8  to be free from cruel and unusual punishment.

 9      Now, the court will give you final instructions, and he

10  has to prove certain things by a preponderance of the

11  evidence.  And Ms. Craft said it was over 51 percent.  More

12  likely than not may be a better way to put it.  Or you can

13  kind of draw a football analogy.  It's kind of like one team

14  moves the football, they don't get into the end zone, but

15  they get it down the field.  They have to prove things more

16  likely than not over that 50 yard line.  They have to prove

17  it on both occasions each separate defendant used malicious

18  and sadistic force against the plaintiff.  And the judge

19  will define what malicious and sadistic means.  And then the

20  purpose, the sole purpose of them doing what they did was to

21  cause him harm, or to hurt him.  That's the only reason they

22  did it.  They did it sadistically, hatefully.  They came to

23  work with the idea that they were going to hurt somebody.

24  That's what has to be proven in this case; that they acted

25  deliberately, sadistically or maliciously without any just

 1   cause.

 2        There was some indication or some statement by

 3   Ms. Craft that Mr. Crum probably doesn't even know about,

 4   about the incident, he doesn't care enough to even know

 5   about the results of the investigation, the complaint filed

 6   by the plaintiff.  Well, the plaintiff himself testified, my

 7   recollection is, the plaintiff himself testified that Crum

 8   probably did know.  That's the way the Bureau of Prisons

 9   works.  He had been there for ten years.  He knows.  But

10   Crum probably did know what happened with the administrative

11   complaints and went through the process.

12        Again, the court has made it clear throughout the trial

13   that we're not here on anything that happened in another

14   part of the Bureau of Prisons, to other people in the Bureau

15   of Prisons, or anything like that.  We are here strictly on

16   two very specific instances, two very specific allegations:

17   One against Officer Crum on November 1, 2007, and the second

18   against Officer Taylor in 2008 on January 15th.

19        Now, the medical evidence before you is that he was

20   looked at by medical professionals and no injuries were

21   noted.  You can also look at his medical record while he was

22   at USP Lee.  It's an exhibit.  It came in while you all were

23   out.  It came into evidence.  And this is an exhibit, his

24   medical record while he was at the U.S. Penitentiary at Lee

25   County.  There's not one reference in there to injuries

1   sustained either of those dates; that he didn't complain
2   about them to anybody, not just to Mr. Roff and to Nurse
3   Meade, but to anybody at any time, although he received
4   medical care for his asthma and other things on numerous
5   occasions.  Not once did he mention injuries arising from
6   these two instances that he went to seek treatment for.  You
7   will have that, you will have his medical records before you
8   and you can look at that.

9        Now, these corrections officers, they did not come to
10  work that day looking for a struggle, or looking for a
11  situation, if you will.  They didn't, it wasn't their goal
12  in life to come in and have a miserable workday.  Their goal
13  in life was the same as anybody else going to work, and that
14  was to get in, to do a job, to do it the best they could, to
15  do it without any problems, and to get home safely that
16  evening or after their shift change.  They don't have any
17  control.  The evidence is uncontroverted that these two
18  correctional officers have absolutely no control over the
19  cameras, they have no control over the film, they have no
20  control over whether or not pictures were preserved, they
21  have no control over the handling of evidence, they have no
22  control over what the cameras may or may not show, where the
23  cameras were placed.  They have no control over any of that.
24  In the event that you might decide that, well, film or video
25  was not preserved right, or something like that, that's not

1   their fault.  Yes, it may be, you may disagree with the

2   Bureau of Prisons and the way they handled things, but we're

3   not deciding that today.  That is not what's on trial.

4   What's on trial are two corrections officers that were

5   trying to do their job, not the position of the cameras, not

6   what the cameras may or may not show, and not what somebody

7   else in the Bureau of Prisons might decide is significant or

8   not.  They can't control that.  They never see that.  That

9   evidence is clear, and it's uncontroverted.

10       We're here to decide very simply if the defendants Crum

11  and Taylor used excessive force on either or both of the two

12  days in question.  And that's, that's it.  You also heard

13  extensive testimony that there are corrections officers, and

14  there are Bureau of Prisons employees that do do wrong, and

15  they are indicted, and they are prosecuted, and they do get

16  fired, and they are investigated.  And that does, sadly,

17  happen.  Nobody is proud of that.  But it's something that

18  is dealt with in the system, the same as a police officer or

19  federal agent does something wrong -- sadly, it happens --

20  and they do get indicted, they do come before the jury, and

21  if they're convicted they do get sentenced and they do get

22  fired.  But it wasn't the situation in this particular case.

23  But there's no evidence about these two defendants that's

24  anything worthy of such extreme measures at all, none.

25       The defendant (sic) made it clear, I believe, in his

1   testimony that after both instances he was back doing

2   exercises.  And I asked him what kind of exercises that he

3   did and he was back doing push ups several days a week and

4   squats several days a week.  Again, you can look at his

5   medical reports, and you can see that the plaintiff was not

6   injured in any way.

7        Yes, the January 15th incident did occur, but it didn't

8   occur as he described it.  It occurred because, I mean, the

9   officers could not stand there all day and negotiate with

10  him like you were buying a house, or something.  They had to

11  do something with him.  They had, they had a prison, they

12  had the Special Housing Unit, which is like a jail within a

13  jail, and they had to get him back to his cell.  He decided

14  he didn't want to go.  That was his decision, not theirs.

15       Again, they don't come to work looking for trouble.

16  There's just no evidence that they did.  It's just like

17  anybody else, you don't go to work -- sometimes things

18  happen.  Sometimes you have to react to things, and that's

19  what happened here.  It's part of their job.  You can look

20  at the video of the, of the November 1st incident and you

21  will see Mr. Hill standing in his cell shortly afterward,

22  and that conflicts with what he said in his deposition, that

23  he was, that he was crunched over, that he couldn't stand

24  up, that he was dizzy, and he was basically not able to

25  function because of the assault you see from officer Crum.

1    That's just not shown in the deposition, or in the video.

2    We didn't show the whole thing because we didn't want to

3    bore you or make the trial longer than we had to.  I reckon

4    if you want to look at it the court will allow you to do

5    that.  You can look at the whole thing.  You'll see it

6    doesn't change very much, because he's saying it's pretty

7    normal throughout the whole thing, and that evidence is

8    probably the best evidence of the condition that he was in

9    after the November 1st incident.

10        In short, there's no credible testimony that, that

11   Mr. Hill's story regarding that November 1st incident

12   actually happened, and there's plenty of evidence that it

13   did not.  And yes, there was an incident on January 15th,

14   okay?  But he wasn't injured, and the officers didn't

15   overreact.  They did what they had to do to get him back

16   into his cell.

17        In short, the plaintiff is not entitled to any money as

18   a result of this, these incidents from the corrections

19   officers.  This is a tough and dangerous job.  They have to

20   make split second decisions that we can sit here in the

21   courtroom years later and second guess and look and say no,

22   I probably wouldn't have done it that way, or whatever, but

23   we kind of have to look at it through their eyes.  I'm

24   talking about the January 15th incident because the

25   November 1st incident, we contend, just never happened.  The

```
 1    January 15th incident -- and you know, they make split

 2    second decisions, and they do the best they can under those

 3    circumstances.  It's a dangerous and often thankless job

 4    that they have to do.  They're in a maximum security prison,

 5    which is a very difficult place to work, and they're in the

 6    kind of prison within a prison, as I mentioned, where they

 7    have very, very difficult inmates to deal with.  And it was

 8    pointed out they try to deal with them as best they can, but

 9    sometimes it reaches a point that they have to be

10    segregated, they have to be even removed from the other

11    inmates in the penitentiary for various reasons.  This is

12    clearly a case of a plaintiff trying to make the defendants'

13    jobs even tougher than they are.  These are ordinary men

14    living in this community, and there's simply no credible

15    evidence that they were either sadistic or cruel to this

16    plaintiff.

17         Now, they have to be all business, and they have to be

18    fair, and they have to be, do right by the inmates.  But

19    they can't be friends with them, they can't be their

20    buddies.  There has, there has to be very strict

21    requirements as far as rules.  Regulations just have to be

22    followed, and if an inmate decides they aren't going to

23    follow them, they have to be made to follow them.  This is a

24    prison; it's not a summer camp.  The corrections officers

25    have to do it, and it's a difficult job.  Yet these men have
```

```
 1   decided to do it as a career, not for the money, but because
 2   it's something they want to do.
 3        You will get a verdict form from the judge, and you'll
 4   be able to take that verdict form back with you and fill it
 5   out.  You have several options on that verdict form.  So, on
 6   behalf of both Officer Crum and Officer Taylor, I would ask
 7   that you find that they did not violate the constitutional
 8   rights of the plaintiff, and award him no damages at all.
 9        Thank you, very much.  And I apologize to plaintiff's
10   counsel, Ms. Craft if I talked over her in any of our
11   objections, or anything like that.  I appreciate your time
12   very much, and I'm sure the defendants individually
13   appreciate your time very much.  Thank you.
14        MS. SOKOLOWSKI-CRAFT:  I promise I'll make it short
15   so we can all get moving on.  The term that I did not know
16   before I started this case, but I know it very well now, is
17   called, the term is gray wall of silence.  What that means
18   is that's where officers keep quiet with each other about
19   what's going on so nobody is telling on anybody.
20   Essentially it's called the gray wall of silence, and I
21   learned it from Demetrius throughout this proceeding, and
22   the problem is that's just basically where it goes, where is
23   the accountability.
24        You hear defense counsel say, "Oh, well its not their
25   fault that the videos disappear.  We're so sorry about
```

1    that."  Interestingly enough, though, the only video they

2    contend helps them is here.  So, these defendants are told,

3    you know, they are told at some point, somebody has filed

4    complaints against you and that complaint, if you'll look at

5    it, it says they are going to sue you.  And to think that

6    nobody is going to say, you know what, can you maybe save a

7    videotape for me of what happened that day because that

8    might help two or three years later, nobody is going to do

9    that for each other?  However, this happened in, what, 2007,

10   2008.  We are now in 2011, way past the two year rule of

11   retention.  There's still a tape around.  So, who asked for

12   that to be retained?  Who asked for that to be held on to?

13   Because they're claiming that helps them, yet everything

14   else keeps disappearing and going away.  So, somebody has to

15   be held accountable for that.

16        To say these gentlemen are not responsible for it, so

17   please don't hold them responsible is just not fair.  You

18   can't tell an inmate who is filing complaints and is going

19   through instances, and is getting beat up, and is put in

20   restraints, that, "Oh, we're sorry.  It's not our fault."

21   But that's not fair, that's not the way our judicial system

22   works.

23        The defense will tell you this isn't the Government

24   being sued; these are these individuals, and it's coming out

25   of their pockets.  That's fine and dandy, but that's a

1   defense attorney for the Government, and you heard yourself

2   Crum stand up and say he didn't know about this lawsuit.  I

3   don't know, I don't know what goes on between counsel and

4   clients, and obviously don't know what's going on here, but

5   that really makes you question how much are they telling

6   these individuals, "Don't worry about this," or, "This will

7   be taken care of."  There's got to be some discussion, it's

8   just so hard for me to believe that somebody is going to

9   walk through this courtroom and not even know when a

10  complaint was filed against them, and not know when there

11  were incident reports against him, so to say these are just

12  these individuals and don't blame them, it's not their

13  fault, that's just not an acceptable answer.

14      At the end of the day your tax dollars are paying for

15  this facility, and to say people can just go into this

16  facility and do whatever they want and run the facility how

17  they want and they won't be held accountable for it, because

18  there's just some policy out there that said we didn't need

19  to do this, or we didn't need to do that, is not a fair

20  enough excuse.

21      Even further, I remind you of Lawrence Johnson's

22  testimony.  These guys never knew each other back then.  But

23  yet they both say similar incidences about Taylor.  Johnson

24  said, "I walked by him and I brushed up against him, and he

25  deemed that an assault and therefore a use of force was

1    initiated and a report was written up against me."  So, a

2    brushing up against your shoulder is deemed an assault.  I

3    would hate to see what else Mr. Taylor deems an assault.  If

4    you accidentally tap him, is that use of force being used

5    against you?

6         To say that Mr. Hill is just doing this to make this

7    difficult for the officers, first of all he's no longer at

8    USP Lee, so whatever he would be doing, he's not going back

9    there, he's not going to be in the care of these

10   individuals, so that's not an issue.  And also keep in mind,

11   we have Fortner up here testifying that he was part of that

12   interaction in January, also.  Mr. Hill did not sue Mr.

13   Fortner.  So, if you want him to go after everybody, he

14   could have sued everybody, Fortner, any other individuals as

15   third party that supposedly was there.  But he didn't.  He

16   went specifically -- he named Taylor.

17        There's a reason for that.  The reason for that is

18   because the event happened, and the events happened on

19   November 1st just as well.

20        We'd ask this jury to find in favor of the plaintiff,

21   and to grant a monetary award to make the defendants be held

22   accountable for their actions.  Thank you.

23        (Proceedings were had and reported, but not

24   transcribed.)

25        (Proceedings concluded at 3:50 p.m.)

CERTIFICATE


     I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.



4/24/12                    /s/ Bridget A. Dickert
Date                         U.S. Court Reporter